IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL CARDONE, RYAN HICKE, CLAY STREET HOLDINGS, LLC DNK INVESTMENTS 3 LLC, AND ROSENBLUM FAMILY L.P., : : : : : | |
| Plaintiffs, : : | |
| v. : : | NO. _____ |
| MOHAMED ZERBAN, AND TERN WATER, INC., : : : | |
| Defendants. : : | |

**COMPLAINT**

Plaintiffs, Michael Cardone ("Cardone"), Ryan Hicke ("Hicke"), DNK Investments 3 LLC ("DNK"), Clay Street Holdings, LLC ("CSH"), and Rosenblum Family L.P. ("RFLP," and collectively with Cardone, Hicke, DNK, and CSH "Plaintiffs") bring this Complaint against defendants Mohamed Zerban ("Zerban") and Tern Water, Inc. ("Tern," and collectively with Zerban "Defendants") for violations of 15 U.S.C. § 78j(b) ("Section 10(b) of the Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5 promulgated thereunder"), fraud, negligent misrepresentation, and breach of contract, and in support thereof aver as follows.

**Introduction**

1. Plaintiffs bring this action for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, fraud, negligent misrepresentation, and breach of contract against Defendants. At bottom, this case concerns Defendants' fraudulent scheme to extract capital from Plaintiffs to keep Tern Water afloat, based on, in part, Defendants' false

representations about Tern's capitalization structure. Zerban, Tern's majority shareholder and CEO, solicited investments from Plaintiffs, which investments took the form of notes that were convertible to equity upon the occurrence of certain events. In response to Plaintiffs' diligence requests, Zerban represented and warranted that Tern had no outstanding "Preferred Stock" at the time of Plaintiffs' investments and provided Plaintiffs a false capitalization table which omitted the existence of the Company's Preferred Stock. In reality, all of Tern's Preferred Stock had been issued. Zerban and Tern knowingly, or at least recklessly, misrepresented that Tern had no outstanding Preferred Stock at the time of Plaintiffs' investments.

2. Zerban and Tern also misrepresented the state of Tern's financial performance. During diligence, Zerban provided Plaintiffs variations of a one-page spreadsheet which purported to detail the Company's expenses and revenues. Those spreadsheets did not reflect a complete picture of Tern's finances (and Plaintiffs, to date, have been unable to verify their accuracy). Prior to each closing, Tern represented and warranted (and Zerban executed those representations and warranties on Tern's behalf) that it provided all Plaintiffs with accurate financial statements, including the Company's balance sheet. Those representations and warranties were false. Indeed, despite Plaintiffs continuous post-closing efforts to obtain accurate financial records from the Company, and Zerban's repeated assurances that records would be provided, Zerban and Tern have failed to provide Plaintiffs any documents reflecting the Company's performance.

### The Parties

3. Cardone is an adult individual who resides in Pennsylvania.

4. Hicke is an adult individual who resides in Pennsylvania.

5. DNK is a limited liability company organized under the laws of the Commonwealth of Pennsylvania.

6. CSH is a limited liability company organized under the laws of the Commonwealth of Pennsylvania.

7. RFLP is a limited partnership organized under the laws of the Commonwealth of Pennsylvania.

8. Zerban is an adult individual who, upon information and belief, resides in Pennsylvania.

9. Tern is a company incorporated under the laws of the State of Delaware with a principal place of business in Pennsylvania.

## Jurisdiction and Venue

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over pendant state law claims).

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Tern is a corporation incorporated in Delaware and the relevant agreements at issue confer jurisdiction on this Court.

## Company Background

12. Tern is a company that is developing and marketing a "Smart Faucet" for consumer use. The Smart Faucet is touted as a revolutionary faucet that will allow consumers to improve their water quality and safety using a filter at the point-of-use. To achieve this goal, the Faucet uses a replaceable filter. Tern also markets or plans to market a "Know Your Water" feature that compliments the Smart Faucet. This feature permits consumers to test their water at the faucet for impurities and customize their filter needs. The Smart Faucet is designed to connect with phones

and "Smart" hubs to inform users when the Faucet's batteries and filters need replacement and to relay information from the Know Your Water feature.

13. Zerban is the founder, CEO, and majority owner of Tern.

14. In approximately 2016, Tern began development of the Smart Faucet. In November 2018, Tern launched an Indiegogo campaign to accept preorders for the Smart Faucet. Indiegogo is an online platform that pairs entrepreneurs and inventors with customers, who preorder (and prepay) for products that they find desirable, typically based on marketing and prototypes. Fifty-four customers "backed" the Smart Faucet and paid Tern an approximate amount of $9,505, less Indiegogo's service fees.

15. Tern experienced delays in developing and launching the Smart Faucet. The Smart Faucet was originally slated to ship in April 2019 to Indiegogo backers, but Tern missed that deadline. Some consumers questioned when their Smart Faucet would arrive. Zerban responded "If we wanted to sacrifice quality, we could have been done in April," but that consumers were "buying into the idea of improved water inside their homes. The product is cool and all, but it's about the service, the knowledge, the understanding [of] what they're consuming." Attached hereto as **Exhibit A** is an online article quoting Zerban regarding shipment of the Smart Faucet.

16. Plaintiffs were impressed with the vision of the Smart Faucet, as presented by Zerban. Plaintiffs believed—and still believe—that the Smart Faucet, and its underlying intellectual property, is cutting-edge technology that addresses real consumer needs at an accessible cost. However, under Zerban's rudderless direction, Tern has been utterly unable to launch the Smart Faucet to market; instead, Tern and Zerban have resorted to bilking investors to keep the Company viable.

17. Plaintiffs understand that the Smart Faucet has yet to ship to consumers. Although Zerban has assured Plaintiffs that the Faucet is nearly complete, Plaintiffs are unable to confirm that assertion.

### Plaintiffs' Diligence, Zerban's and Tern's Misrepresentations and Omissions, and Plaintiffs' Resultant Investment

18. Upon information and belief, Zerban understood that Tern required additional capital to continue development and production of the Smart Faucet. Additionally, Zerban desired guidance from prominent and successful members of the Philadelphia business community. To that end, Zerban sought and obtained investments from RFLP (led by Jeffery Rosenblum ("Rosenblum")); Ryan Hicke, Michael Cardone, DNK (led by David Katz ("Katz")), and CSH (led by Zachary Klehr ("Klehr")).

19. Plaintiffs conducted due diligence prior to their investments in Tern. Despite Plaintiffs' best efforts to obtain accurate information concerning Tern's capitalization structure and financial statements, Zerban, on behalf of Tern, misrepresented the true nature of the Company's capital structure and financial statements.

20. On October 24, 2019, Klehr, on behalf of CSH, emailed Zerban a list of "Diligence items," including the "Current Cap Table," "Operating model / Cash flow forecast," and "Current/most recent balance sheet" that CSH required before investing. A copy of Klehr's email dated October 24, 2019 to Zerban is attached hereto as **Exhibit B.**

21. Zerban responded to Klehr's email on October 31, 2019, attached the "Current Cap Table," and noted that it "Doesn't include noteholders." Zerban also attached the Company's purported "2017,2018 Actual numbers." However, the capitalization table Zerban attached to his email **excluded** Preferred Shares that Tern previously issued. In response to Klehr's request for financial documents, Zerban merely attached a single-page document which purported to detail

5

Tern's expenses and revenues.  This document was incomplete and did not include a balance sheet or any other relevant financial information.  A copy of Zerban's email dated October 31, 2019 to Klehr is attached hereto as **Exhibit C.**

22. Similarly, Katz, on behalf of DNK, inquired into the Company's capitalization table's accuracy.  On November 6, 2019, Zerban assured Katz that "Exhibit B [the Company's capitalization table appended to the Purchase Agreement (as defined below)] is correct, Those are the equity holders."  A copy of Zerban's email to Katz dated November 6, 2019 is attached hereto as **Exhibit D.**  Zerban's statement was a misrepresentation because the capitalization table excluded that all of Tern's Preferred Shares were outstanding at the time of investment.  Further, as described above, the financial statements that Zerban attached to his email were incomplete.

23. Despite the remaining Plaintiffs' diligence into the Company, they were also misled by Zerban and Tern regarding the Company's capitalization.

24. Zerban knew or should have known that the Company's capital structure was materially important to Plaintiffs' consideration of their investment.  Zerban also knew or should have known that accurate financial statements reflecting the Company's performance were materially important to Plaintiffs' consideration of their investment.  Despite this knowledge, Zerban did not disclose to Plaintiffs that **all** of the Company's Preferred Shares had been issued prior to Plaintiffs' investment.  Nor did Zerban provide Plaintiffs with accurate financial statements.  The reasons for Zerban's (and Tern's) misstatements and omissions are simple:  he knew that Plaintiffs would not invest in the Company had they known the truth.

25. On or about January 22, 2019, RFLP provided $250,000 to Tern in exchange for a Convertible Promissory Note (a "Note") issued by the Company.  A copy of the RFLP Note is attached hereto as **Exhibit E.**  Simultaneous to the issuance of the Note, Tern and RFLP entered

into a "Convertible Notes Purchase Agreement" (a "Purchase Agreement"). A copy of the RFLP Purchase Agreement is attached hereto as **Exhibit F**. Exhibits E and F were executed by RFLP; RFLP believes that Zerban, on behalf of Tern, executed the Note and Purchase Agreement, but do not have a copy of same in its files. In any event, even if Zerban or Tern did not countersign the Note and Purchase Agreement, Tern accepted RFLP's $250,000 wire and acted as if an agreement had been struck.

26. On or about January 21, 2019, Hicke provided $125,000 to Tern in exchange for a Note issued by the Company. A copy of the Hicke Note is attached hereto as **Exhibit G.** Simultaneous to the issuance of the Note, Tern and Hicke entered into a Purchase Agreement. Zerban executed the Purchase Agreement on behalf of Tern. A copy of the Hicke Purchase Agreement is attached hereto as **Exhibit H**.

27. On or about August 8, 2019, Cardone provided $150,000 to Tern in exchange for a Note issued by the Company. A copy of the Cardone Note is attached hereto as **Exhibit I.** Simultaneous to the issuance of the Note, Tern and Cardone entered into a Purchase Agreement. Zerban executed the Purchase Agreement on behalf of Tern. A copy of the Cardone Purchase Agreement is attached hereto as **Exhibit J**.

28. On or about November 6, 2019, DNK provided $100,000 to Tern in exchange for a Note issued by the Company. A copy of the DNK Note is attached hereto as **Exhibit K.** Simultaneous to the issuance of the Note, Tern and DNK entered into a Purchase Agreement. Zerban executed the Purchase Agreement on behalf of Tern. A copy of the DNK Purchase Agreement is attached hereto as **Exhibit L**.

29. On or about November 19, 2019, CSH provided $100,000 to Tern in exchange for a Note issued by the Company. A copy of the CSH Note is attached hereto as **Exhibit M.**

Simultaneous to the issuance of the Note, Tern and CSH entered into a Purchase Agreement. Zerban executed the Purchase Agreement on behalf of Tern. A copy of the CSH Purchase Agreement is attached hereto as **Exhibit N**.

30. Prior to conversion, each Note carried an interest rate of 8%. Each of Plaintiffs' Notes are convertible to equity in the Company upon the occurrence of certain events. It was the parties' collective expectation that the Notes would convert to equity.

31. Each of the Purchase Agreements, which were executed by Zerban on behalf of the Company, contained representations and warranties. In Section 3.3(a) of the Purchase Agreements, the Company represented that

> Immediately prior to the Initial Closing [which is defined as the date of each Purchase Agreement], the authorized capital stock of the Company will consist of 1,520,000 shares of Common Stock, of which approximately 1,470,000 shares are issued and outstanding, and 80,000 shares of Preferred Stock, all of which are designated Series Seed Preferred and none of which are issued and outstanding.

The Company also represented in Section 3.3(c) of the Purchase Agreements that "The capitalization of the Company immediately prior to the Initial Closing is as set forth on Exhibit B hereto." Exhibit B, attached to each Purchase Agreement, did not list any preferred shareholders.

32. Zerban and Tern knew or should have known that the representations and warranties contained within Section 3.3(a) and 3.3(c) of the Purchase Agreements were false because all of the Company's Preferred Shares were outstanding at the time of each Plaintiff's investment.

33. Section 3.5 of the Purchase Agreement concerned financial statements. The Company represented that it

> has made available to the Investors the unaudited balance sheet and income statement of the Company as of and for the period ended December 31, 2018 . . .

> The Financial Statements are correct in all material respects and present fairly the financial condition and operating results of the Company as of the date(s) and during the period(s) indicated therein. . . .

34.     Zerban and Tern knew or should have known that the representations and warranties contained within Section 3.5 of the Purchase Agreements were false because no balance sheet or income statement was ever provided to Plaintiffs.  Moreover, the records that Zerban did provide to Plaintiffs during diligence were incomplete and did not reflect the Company's complete finances.

35.     Section 7.2 of each Purchase Agreement contains an indemnification provision that requires Tern to indemnify Plaintiffs

> . . . . from and against and in respect of, and shall hold each of them harmless from and against and in respect of, and shall pay and reimburse each of them for, any and all losses, damages, liabilities, deficiencies, judgments, assessments, awards, penalties, fines, costs or expenses of whatever kind (regardless of whether or not such losses, deficiencies, damages, expenses, liabilities, claims, assessments and judgments involve or relate to a third party claim and shall include, without limitation, all diminution in value other than diminution in value to the extent calculated based on a multiple), including reasonable attorneys' fees, incurred or sustained by, or imposed upon such Indemnified Person, but excluding indirect, incidental, consequential, special or punitive damages and any damages calculated based on any type of multiple (including but not limited to loss of future revenue or income, loss of business reputation or opportunity) (collectively, the "Indemnifiable Expenses"), based upon, arising out of, with respect to, resulting from or by reason of any inaccuracy in or breach of any of the representations, warranties or covenants of the Company contained in this Agreement, this Agreement or any other certificate or instrument delivered to the Investors hereunder. . . .

**<u>Katz and Klehr Serve as Advisors to<br>Company Post-Acquisition and Uncover Zerban's Misstatements and Omissions</u>**

36.     As part of DNK and CSH's investments, Zerban asked that Katz and Klehr serve as advisors to the Company.  Katz and Klehr undertook those responsibilities and worked to professionalize the company.  During that process they uncovered Zerban's misstatements and omissions that Zerban and Tern made to induce Plaintiffs to invest in the Company.

9

37. After Klehr began his advisory role, Zerban requested that Klehr, work to "clean up" Tern's capital structure record keeping and to upload that information to a digital capitalization table management platform. Upon information and belief, Zerban requested Klehr "clean up" the capitalization record keeping because he knew it was false. On January 12, 2020, Klehr wrote to Zerban: "Preferred Shares – it appears in the documentation that all 240,000 of the authorized preferred shares have been issued." Klehr wondered whether those shares had "been converted to common" because the "preferred holders are showing common share ownership." A copy of Klehr's email to Zerban dated January 12, 2020 is attached hereto as **Exhibit O.**

38. Despite Defendants' prior misstatements regarding the lack of outstanding preferred shares, Zerban responded blithely, "Shares have not been converted yet. Preferred stock owners still hold the same class of shares." Zerban continued by confirming the number of *Preferred Shares* outstanding and commented that "The cap table should be updated accordingly." A copy of Zerban's email to Klehr dated January 13, 2020 is attached hereto as **Exhibit P.**

39. Klehr, Katz, and Zerban had a meeting in January 2020 regarding the falsehoods in the Company's capitalization table. Klehr and Katz stressed to Zerban that this is a serious issue, which required Zerban's immediate attention. Zerban downplayed the issue.

40. Zerban never updated the Company's capitalization table. Nor did Zerban ever explain to Plaintiffs why he did not disclose to Plaintiffs that the Company had issued all of its Preferred Shares prior to their investment.

41. After closing their investment, Plaintiffs repeatedly requested financial information from Zerban and Tern. In turn, Zerban repeatedly assured Plaintiffs that the Company would provide updated financial records, including bank statements and tax returns, but never provided Plaintiffs a single financial record.

42.     After a period of time Katz and Klehr became frustrated with Zerban's disdain for proper corporate governance, appropriate record keeping, and communication with Company stakeholders and resigned from their positions as advisors to the Company.

### Plaintiffs Issue a Notice of Default to Tern

43.     On June 12, 2020, Plaintiffs issued a Notice of Default to Tern ("Default Notice") that accelerated all amounts due under all of the Notes Tern issued pursuant to Section 7.  Plaintiffs demanded payment thereunder.  A copy of the Default Notice is attached hereto as **Exhibit Q**.  To date, Tern has not repaid any amount due on the Notes.

44.     After Plaintiffs issued the Default Notice, Zerban engaged in additional wrongful actions relating to corporate governance of Tern, specifically related to the composition of the Company's Board of Directors.  Prior to the dispute with Plaintiffs, Tern had formally appointed the investor to the Board and that investor participated in multiple Board meetings.  Upon information and belief, after the dispute arose, Zerban knew that the investor would not be willing to assist Zerban in a scheme to continue to defraud Plaintiffs, and unilaterally declared that the investor had never been a member of the Board of Directors.

### COUNT I – Against All Defendants
### Violation of Section 10(b) (15 U.S.C. § 78j) of the
### Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5)

45.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

46.     Zerban misrepresented to Plaintiffs the capital structure of Tern prior to their investments.  Zerban provided Plaintiffs a capitalization table prior to their investments which falsely listed no outstanding Preferred Shares; Zerban also independently confirmed that the capitalization table was accurate.  *See* Exhibits B-D.  In Sections 3.3(a) and (c) of the Purchase

Agreements, Tern represented and warranted that the Company had no outstanding Preferred Shares at the time of Plaintiffs' investments and that the capitalization table appended to the Notes was accurate.  *See* Exhibits F, H, J, L, and N.  These representations and warranties were false when made.  Zerban knew or should have known that these representations were false when he executed the Purchase Agreements on behalf of Tern.

47. Zerban also misrepresented to Plaintiffs the true nature of Tern's financial statements.  Zerban provided incomplete financial statements to Plaintiffs prior to their investment in the Company.  Further, pursuant to Section 3.5 of the Purchase Agreements, Tern represented and warranted that each Plaintiff was provided financial statements that were "correct in all material respects and present fairly the financial condition and operating results of the Company."  These representations were false because the financial statements provided to Plaintiffs prior to closing were variations of a one-page spreadsheet which were materially incomplete.  Zerban knew or should have known that these representations were false when he executed the Purchase Agreements on behalf of Tern.

48. Zerban and Tern acted with scienter when making the aforementioned misrepresentations and omissions.  Zerban, the founder, CEO, and majority shareholder of Tern knew that Tern needed additional capital and that Plaintiffs would not invest in the Company if they knew the true nature of its financial statements and capital structure.  Therefore, Zerban and Tern either purposefully or recklessly misrepresented and omitted material information concerning the Company's financial statements and capital structure to induce Plaintiffs to invest.

49. Had Plaintiffs known that the Company had previously issued **all** of its Preferred Shares and the true nature of Tern's financial statements, Plaintiffs would not have purchased the Notes.

50. Plaintiffs justifiably relied on Zerban and Tern's misrepresentations and omissions when making their investments.

51. The value that Plaintiffs understood they were receiving from their investments has been destroyed by Zerban and Tern's misrepresentations and omissions. This loss of value is a direct result of Zerban and Tern's misrepresentations and omissions.

52. Under federal law, Zerban is individually liable as a maker of the misrepresentations and omission to Plaintiffs. Tern is also liable for these misrepresentations and omissions.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants, including:

A. Compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law and the Notes;

B. All costs and expenses incurred in this Action, including attorneys' fees;

C. Awarding such other further relief as may be just and proper.

### COUNT II – Against All Defendants
### Fraud in the Inducement

53. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

54. Zerban misrepresented to Plaintiffs the capital structure of Tern prior to their investments. Zerban provided Plaintiffs a capitalization table prior to their investments which falsely listed no outstanding Preferred Shares; Zerban also independently confirmed that the capitalization table was accurate. *See* Exhibits B-D. In Sections 3.3(a) and (c) of the Notes, Tern represented and warranted that the Company had no outstanding Preferred Shares at the time of

13

Plaintiffs' investments and that the capitalization table appended to the Notes was accurate. *See* Exhibits F, H, J, L, and N. These representations and warranties were false when made. Zerban knew or should have known that these representations were false when he executed the Purchase Agreements on behalf of Tern.

55. Zerban also misrepresented to Plaintiffs the true nature of Tern's financial statements. Zerban provided incomplete financial statements to Plaintiffs prior to their investment in the Company. Further, pursuant to Section 3.5 of the Purchase Agreements, Tern represented and warranted that each Plaintiff was provided financial statements that were "correct in all material respects and present fairly the financial condition and operating results of the Company." These representations were false because the financial statements provided to Plaintiffs prior to closing were variations of a one-page spreadsheet which were materially incomplete. Zerban knew or should have known that these representations were false when he executed the Purchase Agreements on behalf of Tern.

56. Zerban and Tern's misrepresentations and omissions were material to the transactions. Had Plaintiffs known that the Company had previously issued **all** of its Preferred Shares and the true nature of Tern's financial statements Plaintiffs would not have purchased the Notes.

57. Zerban, the founder, CEO, and majority shareholder of Tern knew that Tern needed additional capital and that Plaintiffs would not invest in the Company if they knew the true nature of its financial statements and capital structure. Therefore, Zerban and Tern either purposefully or recklessly misrepresented and omitted material information concerning the Company's financial statements and capital structure to induce Plaintiffs to invest.

58. Plaintiffs justifiably relied upon Zerban and Tern's representations.

59. The value that Plaintiffs understood they were receiving from their investment has been destroyed by Zerban and Tern's misrepresentations and omissions. This loss of value is a direct result of Zerban and Tern's misrepresentations and omissions.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants on Count II of its Complaint as follows:

    A.    Rescission of the Purchase Agreements and Notes (and absent rescission, compensatory damages);

    B.    Interest on the Notes, as allowed by Law and the Notes;

    C.    Punitive Damages

    D.    All costs and expenses incurred in this Action, including attorneys' fees;

    E.    Awarding such other further relief as may be just and proper.

### COUNT III – Against All Defendants
### Negligent Misrepresentation (In the Alternative)

60. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

61. Zerban and Tern had a duty to provide accurate financial statements and information regarding the Company's capital structure to Plaintiffs in connection with their investment in the Company.

62. Zerban and Tern breached their duties to Plaintiffs by falsely representing and warranting that the Company's financial statements were "correct in all material respects and present fairly the financial condition and operating results of the Company."

63. Zerban and Tern also breached their duties to Plaintiffs by falsely representing and warranting that the Company's capitalization structure contained no outstanding Preferred Shares.

64. Zerban and Tern should have known that its representations and warranties were false.

65. The value that Plaintiffs understood they were receiving from their investment has been destroyed by Zerban and Tern's misrepresentations and omissions. This loss of value is a direct result of Zerban and Tern's misrepresentations and omissions.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants on Count III of its Complaint as follows:

    A.    Rescission of the Purchase Agreements and Notes (and absent rescission, compensatory damages);

    B.    Interest on the Notes, as allowed by Law and the Notes;

    C.    Punitive Damages

    D.    All costs and expenses incurred in this Action, including attorneys' fees;

    E.    Awarding such other further relief as may be just and proper.

### COUNT IV – Against Tern
### Breach of Contract (Indemnification)

66. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

67. Plaintiffs and Tern each entered a Purchase Agreement regarding Plaintiffs' purchase of the Notes.

68. In Section 3.3(a) of the Purchase Agreements Tern represented and warranted that

> Immediately prior to the Initial Closing [which is defined as the date of each Purchase Agreement], the authorized capital stock of the Company will consist of 1,520,000 shares of Common Stock, of which approximately 1,470,000 shares are issued and outstanding, and 80,000 shares of Preferred Stock, all of which are designated Series Seed Preferred and none of which are issued and outstanding.

69. In Section 3.3(c) of the Purchase Agreements Tern represented and warranted that "The capitalization of the Company immediately prior to the Initial Closing is as set forth on Exhibit B hereto." Exhibit B, attached to each of the Purchase Agreement, did not list any preferred shareholders.

70. Tern's representations and warranties in Sections 3.3(a) and (c) of the Purchase Agreements were false at the time they were made. All of the Company's Preferred Shares were outstanding at the time that Plaintiffs invested in the Company.

71. Tern also represented and warranted in Section 3.5 of the Purchase agreement that the Company

> has made available to the Investors the unaudited balance sheet and income statement of the Company as of and forth period ended December 31, 2018 . . . The Financial Statements are correct in all material respects and present fairly the financial condition and operating results of the Company as of the date(s) and during the period(s) indicated therein. . . .

72. Tern's representation and warranty contained within Section 3.5 of the Purchase Agreements was false when made. Prior to the closing of each Note Purchase, Tern only Plaintiffs a one-page spreadsheet which purported to contain the Company's expenses and revenues. Tern never provided a balance sheet to Plaintiffs. Nor has Tern provided any income statements to Plaintiffs.

73. Section 7.2 of the Purchase Agreements requires Tern to indemnify Plaintiffs for these breaches. Part of Tern's indemnification obligation is reimbursement of Plaintiffs' attorneys' fees.

74. The value that Plaintiffs understood they were receiving from their investment has been destroyed by Tern's breach of contract.

PHIL1 9064700v.4

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Tern on Count IV of its Complaint as follows:

      A.    Compensatory damages;

      B.    Interest on the Notes, as allowed by Law and the Notes;

      C.    All costs and expenses incurred in this Action, including attorneys' fees.

### COUNT V – Against Tern
### Breach of Contract (Acceleration of Notes)

75. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

76. Pursuant to Section 7 of the Purchase Agreements, Plaintiffs issued the Default Notice to Tern because Tern breached Sections 3.3(a), 3.3(c), and 3.5 of the Purchase Agreements. The Default Notice declared default and accelerated all principal and interest due under the Notes. *See* Exhibit Q.

77. As of the date of the Default Notice, June 12, 2020, Tern owed all Noteholders an aggregate total of $725,000 and accrued interest in the amount of $61,956. Interest at the rate of 8% per annum continues to accrue.

78. Tern has not paid Plaintiffs any sum of money after receiving the Default Notice.

79. Tern has breached its contract to Plaintiffs and is responsible for immediately repaying the Notes with interest.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Tern on Count V of its Complaint as follows:

      A.    Compensatory damages;

      B.    Interest on the Notes, as allowed by Law and the Notes;

   C. All costs and expenses incurred in this Action, including attorneys' fees.

### COUNT VI – Against Tern
### Promissory Estoppel (In the Alternative)

80. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

81. Tern made a series of promises to Plaintiffs, including that Tern would provide accurate financial information of about the Company prior to investment, that there were no outstanding preferred shares, and that Tern would pay to the noteholders interest and principal payments or convert their investments under the Notes to equity.

82. Tern reasonably expected its promise to induce Plaintiffs to provide funding to Tern.

83. All the Noteholders reasonably relied upon Tern's promise provided funds to Tern when they provided funding to tern.

84. Tern's promise is binding and to allow Tern to avoid such promise would cause injustice to Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Tern on Count VI of its Complaint as follows:

   A. Compensatory damages;

   B. Interest on the Notes, as allowed by Law and the Notes;

   C. All costs and expenses incurred in this Action, including attorneys' fees.

| | |
|---|---|
| DATED: October 3, 2020 | **KLEHR HARRISON HARVEY BRANZBURG LLP** |
| | /s/ *Sean M. Brennecke* |
| | Sean M. Brennecke (DE Bar No 4686) |
| | 919 N. Market St., Suite 1000 |
| | Wilmington DE, 19801 |
| | Tel: (302) 552-5501 |
| | Fax: (302) 426-9193 |
| | sbrennecke@klehr.com |